UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 05/11/2023
```

-----------------------------------------------------------------------X
                                                  :
PAUL PENNOLINO,                                   :
                                                  :
                          Plaintiff,              :
                                                  :
                                                  :          22-cv-5051 (LJL)
              -v-                                 :
                                                  :          OPINION AND ORDER
CENTRAL PRODUCTIONS LLC,                           :
                                                  :
                          Defendant.              :
                                                  :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendant Central Productions LLC ("Defendant" or "Central Productions") moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the fourth, fifth, and sixth causes of action in the amended complaint of Plaintiff Paul Pennolino ("Plaintiff" or "Pennolino") for failure to state a claim upon which relief can be granted. Dkt. No. 25. For the reasons set forth below, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

The Court accepts as true for purposes of this motion the well pleaded allegations of the amended complaint, Dkt. No. 17 ("Amended Complaint" or "Am. Compl."), as supplemented by the documents incorporated by reference therein.

Plaintiff is an accomplished director, assistant director, and producer with almost forty years of experience in the industry. *Id.* ¶ 14. He has received multiple nominations for Emmy Awards and Directors Guild of America Awards, including a 2020 Emmy nomination for Outstanding Director for a Variety Series for John Oliver's Last Week Tonight, and a 2017 Emmy nomination for Outstanding Director for a Variety Special for Full Frontal with Samantha Bee Presents the Not the White House Correspondents Dinner. *Id.* ¶ 15. He has directed two

widely known and culturally significant television programs:  The Daily Show with Trevor Noah ("The Daily Show") and Last Week Tonight with John Oliver.  *Id.* ¶ 16.  Defendant is a production company that employed Plaintiff as a director of The Daily Show.  *Id.* ¶ 1.  Plaintiff has worked for The Daily Show as a director or assistant director for twenty-one years.  *Id.* ¶ 17.

On June 24, 2020, Plaintiff and Defendant entered into an agreement (the "Personal Services Agreement" or "Agreement," and the body of such agreement, exclusive of any exhibits, the "Deal Terms") for Plaintiff to render directing services in connection with The Daily Show, including its thirty-minute and sixty-minute special editions (collectively, the "Series").  *Id.* ¶ 25.  Plaintiff is defined as the "Artist" in the Personal Services Agreement and Defendant is defined as the "Company."  Dkt. No. 27-2 at ECF pp. 2, 5.  The Personal Services Agreement confirms the understanding between Plaintiff and Defendant that Plaintiff will "render directing services" in connection with the Series.  Deal Terms[1] § 1.  Section 1 of the Deal Terms states in full:

> SERVICES: Artist shall render artistic and professional services as a director in connection with the Series.  Artist agrees and represents that Artist shall: (i) report and be available to render services at all times and places which Company may from time to time reasonably require; (ii) at Company's discretion, render all services customarily rendered by directors in the television industry (including, without limitation, services in connection with rehearsals, directing, editing and dubbing of the Series, commercials, trailers and other filmed material, promotional or otherwise, to be exhibited or telecast in connection with the Series); (iii) act as a consultant for set and graphic design, lighting, bumpers and open for the Series; (iv) attend production planning meetings; and (v) comply with Company's instructions and regulations in all matters, including, without limitation, artistic taste.

*Id.* § 1; *see* Am. Compl. ¶ 26.

---

[1] When used in a citation, "Deal Terms" refers to the agreement located at Dkt. No. 27-2 at ECF pp. 2–4; Exhibit A refers to the agreement located at Dkt. No. 27-2 at ECF pp. 5–17.

Section 7 of the Deal Terms states, in relevant part: "Provided Artist fully performs all material obligations of this Agreement, Artist shall receive 'Directed by' screen credit on all episodes of the Series on which Artist renders such services.  All other aspects of Artist's credits shall be in the Company's sole discretion."  Deal Terms § 7; *see* Am. Compl. ¶ 31.  The term of the Agreement is from July 2, 2020 through July 1, 2021, subject to the "exclusive, dependent and irrevocable" options of Defendant to extend the Personal Services Agreement, for one-year cycles from July 2, 2021 to July 1, 2022 and from July 2, 2022 to July 1, 2023.  Deal Terms §§ 2, 5.  Under Section 5 of the Deal Terms the option is deemed exercised "unless Company has provided Artist with written notice to the contrary no later than four (4) weeks prior to the end of the previous Cycle."  *Id.* § 5.  The Deal Terms incorporates certain standard terms and conditions set forth in Exhibit A attached thereto (the "Standard Terms" or "Exhibit A") and the "minimum terms and conditions of the [Directors Guild of America]-Company Agreement to which this Agreement is subject."  *Id.* § 8.  "In the event of conflict between this Agreement and Exhibit 'A,' the former shall control."  *Id.*

In December 2020, Plaintiff co-directed with David Paul Meyer a special of The Daily Show featuring an interview with President Barack Obama (the "Obama Episode"), which was nominated for a Directors Guild of America Award.  Am. Compl. ¶¶ 34, 38.  Plaintiff received accolades from the executives and the production team for his efforts on the program.  *Id.* ¶ 35.  On December 11, 2020, Pam DePace, Supervising Producer for The Daily Show, sent an email to Plaintiff and others with the call sheet for the Obama Episode.  *Id.* ¶ 36.  The call sheet listed both Plaintiff and Meyer as directors.  *Id.* ¶¶ 37–38.  And, when Plaintiff requested co-directing credit, DePace and Jill Katz, an Executive Producer—both acting on behalf of Defendant— agreed to give him credit.  *Id.* ¶¶ 40, 45.  However, Defendant did not give Plaintiff co-directing

credit for the Obama Episode and gave sole credit for directing it to Meyer, for which he later received a nomination for a Directors Guild of America Award. *Id.* ¶¶ 41–43. If Plaintiff had received co-directing credit, he would have also received a nomination for his work on the episode. *Id.* ¶ 44.

Plaintiff also received numerous assurances from Katz, Jennifer Flanz, who is another Executive Producer of the Series, and DePace that Defendant would exercise its option to renew Plaintiff's employment for the second year of his contract. *Id.* ¶ 46. On May 28, 2021, however, Naomi Powell, whose relationship to Defendant is not identified in the Amended Complaint, called Plaintiff by telephone and informed him that Defendant would not exercise its option for the second year of his contract. *Id.* ¶ 45. Following the call, Powell sent Plaintiff an email notifying him that Defendant "ha[d] elected not to exercise its Option to pick up Artist for a Second Cycle in connection with the Series." *Id.* ¶ 55. Plaintiff repeatedly pressed for an explanation of why Defendant had refused to exercise its option and was told that it was not performance-based but was related to COVID-19 and the uncertainty surrounding the pandemic. *Id.* ¶¶ 47–49. However, there was no reason why COVID-19 or the related uncertainty prevented Plaintiff from continuing in his position as a director, and Defendant continued to produce The Daily Show. *Id.* ¶¶ 50–52.

Plaintiff's fourth cause of action ("Count Four") alleges breach of the Personal Services Agreement.[2] Plaintiff alleges that Defendant breached the Personal Services Agreement and violated the covenant of good faith and fair dealing (1) by failing to give him "Directed by"

---

[2] Plaintiff's first three causes of action bring claims for age discrimination under the Age Discrimination in Employment Act of 1967, Am. Compl. ¶¶ 74–90, the New York State Human Rights Law, *id.* ¶¶ 91–91, and the New York City Human Rights Law, *id.* ¶¶ 98–104, respectively. Defendant does not move to dismiss those causes of action.

screen credit on all episodes of the Series on which he rendered director services (including the Obama Episode) and (2) by preventing him from directing episodes of the Series during the term of the contract, refusing to give him credit for those episodes, and giving credit for those episodes to Meyer. *Id.* ¶¶ 105–16.  Plaintiff's fifth cause of action ("Count Five") alleges breach of an agreement to give Plaintiff director credit for the Obama Episode.  Plaintiff alleges that on or about December 11, 2020, DePace, on behalf of Defendant, offered to have Plaintiff co-direct the Obama Episode and give him credit for directing that episode, by sending him the call sheet listing him as a director.  *Id.* ¶ 118.  Plaintiff alleges that he accepted that offer by co-directing the Obama Episode, and thereby performed his obligations under the agreement.  *Id.* ¶¶ 119–20, 122.  However, Defendant failed to give Plaintiff credit as a co-director of the Obama Episode. *Id.* ¶ 123.  Plaintiff's sixth cause of action ("Count Six") alleges breach of an agreement to exercise the option for the second year of his employment agreement.  He alleges that, in communications from Katz, Flanz, and DePace, Defendant promised it would exercise its option for the second year of his contract, *id.* ¶ 127, but that Defendant breached that agreement when it informed him on May 28, 2021, that it would not exercise the option, *id.* ¶ 130.

## PROCEDURAL HISTORY

Plaintiff initiated this case by complaint on June 16, 2022.  Dkt. No. 1.  Defendant filed a motion to dismiss the fourth, fifth, and sixth causes of action for failure to state a claim on August 5, 2022.  Dkt. No. 10.  In response, Plaintiff filed the Amended Complaint on August 25, 2022, thereby mooting that motion.  Dkt. Nos. 17, 28.

On September 23, 2022, Defendant filed this motion to dismiss, along with a memorandum of law and a supporting declaration.  Dkt. Nos. 25–27.  Plaintiff filed a memorandum of law and declaration in opposition to Plaintiff's motion to dismiss on October

17, 2022.  Dkt. Nos. 29–30.  On November 7, 2022, Defendant filed a reply memorandum of law in further support of its motion to dismiss.  Dkt. No. 33.

The Court held oral argument on the motion to dismiss on April 19, 2023.  Dkt. No. 47. At oral argument, the Court requested supplemental briefing addressed to the topic of the relationships between Article 16 of the Freelance Live and Tape Television Agreement ("FLTTA") and Section 11 of Exhibit A.  *See* Dkt. No. 52 at 46–48.  Plaintiff and Defendant filed their supplemental letter briefs on April 26, 2023.  *See* Dkt. Nos. 49, 50.  Because Plaintiff's supplemental briefing addressed issues beyond those requested by the Court, *see* Dkt. No. 50 at 3–5, the Court permitted Defendant to submit a two-page response to Plaintiff's letter brief, Dkt. No. 56.  Defendant submitted that response on May 2, 2023.  Dkt. No. 57.

## LEGAL STANDRAD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal

evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

**DISCUSSION**

Defendant argues that Plaintiff's fourth and fifth causes of action are preempted under the Labor Management Relations Act of 1947 ("LMRA") and contradicted by the terms of the Personal Services Agreement.  Dkt. No. 26 at 1.  Defendant further argues that the fourth and fifth causes of action are "belied by the terms of Plaintiff's Personal Services Agreement."  *Id.* Finally, Defendant argues that Plaintiff's fifth and sixth causes of action fail to plead the essential elements of a claim for breach of contract.  *Id.* at 1–2.  The Court addresses each argument in turn.

**I.      LMRA Preemption: Fourth and Fifth Causes of Action**

Defendant argues that Plaintiff's fourth and fifth causes of action are preempted by Section 301 of the LMRA, 29 U.S.C. § 1985, because each requires interpretation of a collective bargaining agreement.  *Id.* at 10–11.  Defendant reasons that because the Personal Services Agreement provides that Plaintiff's services will be rendered pursuant to the terms of the Directors Guild of America, Inc.'s collective bargaining agreement (the "Guild Agreement"), which in turn is subject to the FLTTA, and because the Guild Agreement through the FLTTA, addresses Director credits and controls in the event of a conflict with the Personal Services Agreement, Plaintiff's state-law contract claims necessarily turn upon an interpretation of the collective bargaining agreement and therefore are preempted by Section 301.  *Id.* at 11 & n.11. Plaintiff counters that his fourth and fifth causes of action are entirely independent of the Guild Agreement and thus he can prevail on those claims without interpretation of the Guild Agreement and the LMRA does not preempt his state-law contract claims.  Dkt. No. 30 at 8–13.

Section 301 of LMRA provides:

>Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect of the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  As the Supreme Court has interpreted the provision, Section 301 "requires the federal courts to fashion, from the policy of our national labor laws, a body of federal law for the enforcement of collective bargaining agreements." *Loc. 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962).  Thus, under Section 301, any attempt to enforce a collective bargaining agreement by resort to state law is preempted.  *See Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 25 (2d Cir. 1988).  As the provision has been interpreted by the Supreme Court, "Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'"  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987) (quoting *Electrical Workers v. Hechler*, 481 U.S. 851, 859 n. 3 (1987)).  A contrary conclusion would undermine the objective of Section 301 "to fashion a body of federal law for the enforcement of these collective bargaining agreements."  *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451 (1957).  "[I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles—necessarily uniform throughout the Nation—must be employed to resolve the dispute."  *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–06 (1988) (cleaned up); *see also Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985) ("We do hold that when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." (citation

omitted)).  "The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements."  *Lucas Flour Co.*, 369 U.S. at 103.

However, "a plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights independent of that agreement, including state-law contract rights, so long as the contract relied upon is not a collective-bargaining agreement."  *See Caterpillar*, 482 U.S. at 396. Thus, to invoke Section 301 preemption, it is insufficient to argue that the state-law claim addresses the same subject as the collective-bargaining agreement.  Preemption turns upon whether the Plaintiff, in order to establish his state-law claim, must rely upon a right created by the collective bargaining agreement.  If "the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes."  *Lingle*, 486 U.S. at 410; *see also Caterpillar*, 482 U.S. at 394 ("Section 301 says nothing about the content or validity of individual employment contracts."); *Am. Fed'n of Musicians & Employers' Pension Fund v. Neshoma Orchestra & Singers, Inc.*, 2018 WL 2338764, at *5 (S.D.N.Y. May 23, 2018), *aff'd*, 974 F.3d 117 (2d Cir. 2020) ("Section 301 only provides a basis for jurisdiction over breach of contract claims that allege a breach of a collective bargaining agreement or require interpretation of the terms of a collective bargaining agreement.").  By the same token, "the review of the [collective bargaining agreement] needed to decide preemption in this case is not in itself 'interpretation' warranting preemption; if it were, the preemption doctrine under § 301 would swallow the rule that employees can assert nonnegotiable state law rights that are independent of their collective bargaining agreements." *Foy v. Pratt & Whitney Grp.*, 127 F.3d 229, 234 (2d Cir. 1997).

Plaintiff's fourth cause of action asserts claims based on the Personal Services Agreement.[3]  The Personal Services Agreement provides that the "Artist shall be accorded credit only if provided for in the Deal Terms or in an applicable and binding collective bargaining agreement and only if Artist has performed all services called for by this Agreement."  Exhibit A § 11.  The credit provision of the Deal Terms states:  "Provided Artist fully performs all material obligations of this Agreement, Artist shall receive 'Directed by' screen credit on all episodes of the Series on which Artist renders such services."  Deal Terms § 7.  The Personal Service Agreement, however, incorporates the Guild Agreement.  Section 8 of the Deal Terms incorporates the "minimum terms and conditions of the [Directors Guild of America]-Company Agreement to which this Agreement is subject."  Deal Terms § 8.  Additionally, Section 21 of the Rider to the Standard Terms, entered into by Plaintiff and Defendant on June 24, 2020 ("Rider to Standard Terms"), entitled "UNION/GUILD JURISDICTION; RESIDUALS," provides that these "minimum terms" govern in the event of a conflict with the Personal Services Agreement:

> In the event of any conflict between any mandatory term of the applicable Guild Agreement and this Agreement, the mandatory provision of the Guild Agreement

---

[3] Plaintiff's fifth cause of action alleges that a separate contract was formed between Plaintiff and Defendant for director credit on the Obama Episode.  *See* Dkt. No. 17 ¶¶ 117–25.  This alleged contract does not reference the collective bargaining agreement and does not depend on the collective bargaining agreement; rather, Plaintiff claims that he formed a separate contract with Defendant to receive director credit for the work he performed on the Obama Episode.  *See* Am. Compl. ¶ 121.  Thus, the resolution of Plaintiff's claim is entirely dependent on whether this alleged contract exists and whether Defendant breached the contract by not awarding him director credits, as promised.  It does not depend on the Guild Agreement's or the FLTTA's credit provisions.  *See Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 26 (2d Cir. 1988) ("[T]here is always the possibility that a truly independent contract may coexist with even a current CBA in the proper circumstances, without being preempted by section 301."); *Neshoma Orchestra & Singers, Inc.*, 2018 WL 2338764, at *5 ("Section 301 does not provide a basis for jurisdiction over straightforward state law breach of contract claims that can be decided without any reference to the terms of a collective bargaining agreement.").

shall control and the [Personal Services] Agreement shall be deemed modified to the extent necessary to bring it into compliance with such mandatory provision.

Dkt. No. 27-2 at ECF pp. 16–17.

The Guild Agreement, through the FLTTA, in turn, addresses the awarding of director credits. Article VIII of the Guild Agreement, provides that "[s]creen credits shall be governed by the applicable provisions set forth in the . . . FLTTA." Dkt. No. 27-3 at Art. VIII. Several interlocking provisions of the FLTTA are relevant here. First, Article 16, Section A of the FLTTA addresses "Television Credits." Paragraph 1 of Article 16, Section A states, in relevant part:

> The Company shall give video credit to the Director for each show he or she directs. . . .
>
> (d) It is understood that the Company shall not enter into any agreement with any union, guild or other firm, person or corporation which restrict in any manner the right of a Director to negotiate for screen, paid advertising or other credits in any form desired by him or her, subject to waiver.

Dkt. No. 51-2 at ECF p. 28. Second, Paragraph 3, which is entitled "Credits-Size and Location For Other Than Prime Time and High Budget Dramatic Programs," *id.* at ECF p. 30, contains Subparagraph (g),[4] which limits when an individual can receive director credit: "Except as otherwise provided in this contract, any person who does not direct all elements of the program during broadcast, closed circuit or pre-recording, as the case may be, shall not receive credit as the Director of the program as such, in any form." *Id.* at ECF p. 31. Third, Article 14(A)(3), entitled "Contracts of Employment," which reads: "Nothing herein shall prevent a Director from negotiating or obtaining more favorable terms than those contained in this Agreement." *Id.* at

---

[4] Although Article 16(A)(3)(g) appears only to apply to "other than prime time and high budget dramatic programs," for the purposes of this motion, neither party argues that Article 16(A)(3)(g) is inapplicable to the Series. *Compare* Dkt. No. 49 at 3, *with* Dkt. No. 50 at 2.

ECF pp. 22–23.  Finally, Article 16, Section B of the FLTTA provides a mechanism by which disputes over director credit may be resolved.  It states:

> GUILD TO DETERMINE CONTROVERSY OVER CREDITS: Should more than one Director do substantial work on a program, the Guild and all such Directors shall be notified in writing as to the directorial credit to be given.  Should any such Director be dissatisfied with such determination, he or she may immediately appeal to the Guild and notify the Employer in writing that he or she is doing so.  The Guild may then determine the issue.  The Employer agrees to be bound by such determination as to credits.

Dkt. No. 51-2 at ECF p. 33.

The parties debate the correct interpretation of the Personal Services Agreement, including the Guild Agreement and the FLTTA that are incorporated by reference.  Plaintiff argues that he can pursue a state-law breach of contract claim independent of the terms of the FLTTA.  In his view, the disjunctive language of Section 11 of Exhibit A—which awards him director credit "if provided for in the Deal Terms *or* in an applicable and binding collective bargaining agreement" (emphasis added)—permits him to pursue director credit in this Court if the Deal Terms give him a right to director credit independent of any provision of a collective bargaining agreement.  Dkt No. 50 at 2.  And, he argues, Section 7 of the Deal Terms does just that; that section awards the Artist "'Directed by' screen credit on all episodes of the Series on which Artist renders such services," "[p]rovided Artist fully performs all material obligations of this Agreement."  Deal Terms § 7.  As a result, Plaintiff argues that he need not prove that he has satisfied the provisions of the FLTTA to prevail on his state-law contract claim; his claim to credits stands or falls entirely on whether he performed all material obligations of the Personal Services Agreement and rendered director services under that Agreement.  Dkt. No. 30 at 12–13; *see also* Deal Terms § 1 (defining "Services" that "Artist shall render").

Plaintiff argues that this interpretation is reinforced by Article 16(A)(1)(d) of the FLTTA, which prohibits Defendant from entering any agreement that restricts the rights of a director to

negotiate "for screen, paid advertising or other credits in any form." Dkt. No. 50 at 1–2.  In his

view, this provision is "simply the specific application" of Article 14(A)(3), which establishes

that directors may negotiate more favorable terms than those provided by the FLTTA.  *Id.* at 2.

Thus, to the extent that the Personal Services Agreement incorporates the Guild Agreement and

the FLTTA, the provisions it incorporates include those that permit a director to bargain for a

more favorable award of director credits than contemplated by Article 16(a)(3)(g), which limits

director credit to those who have "direct[ed] all elements of the program."  *Id.* (citation omitted);

*see also id.* (noting that Article 16(A)(3)(g) explicitly contemplates that a director may bargain

for more favorable credits because it begins with the phrase "[e]xcept as otherwise provided in

this contract").  As Plaintiff reasons, there can be no conflict between the Deal Terms and the

collective bargaining agreement because the FLTTA's provisions for director credits permitted

him to negotiate for credit, even if the FLTTA would not independently provide such credit.  *Id.*

at 3.

Defendant counters that to the extent the Deal Terms would permit director credit where

the Guild Agreement and the FLTTA would not, the Guild Agreement and FLTTA must govern.

Specifically, Defendant argues that Article 16(A)(3)(g) must govern because it is the more

specific provision and permitting directors to negotiate for credit without reference to

Article 16(A)(3)(g) would render the dispute mechanisms of Article 16(B) superfluous.  Dkt.

No. 49 at 3.  As Defendant frames the issue, if directors had an "unfettered right[] to negotiate

credits" under Article 16(A)(1)(d), then Article 16(A)(3)(g) would become surplusage and the

dispute resolution provisions of Article 16(B) would have no effect.  *See id.* at 3–4.  And the

purpose of Article 16(a)(3)(g)—to protect against the dilution of credits awarded to those

persons who "direct all elements of the program" by granting credit to those who direct less than

all such elements—would be undermined.  *Id.* at 3.  Thus, the disjunctive "or" in Section 11 of

Exhibit A, Defendant suggests, does not give Plaintiff the right to obtain director credit on

standards less than those provided for in the FLTTA, because the standard in Article 16(a)(3)(g)

is a "minimum term[] and condition[]" mandated of the Guild Agreement which controls over

any contrary language in the Deal Terms.

　　　"[A] written agreement that is complete, clear and unambiguous on its face must be

enforced according to the plain meaning of its terms."  *Greenfield v. Philles Records, Inc.*, 780

N.E.2d 166, 170 (N.Y. 2002); *see also Excel Graphics Techs., Inc. v. CFG/AGSCB 75 Ninth*

*Ave., L.L.C.*, 767 N.Y.S.2d 99, 102 (1st Dep't 2003) (noting that, though a complaint must be

liberally construed in favor of the plaintiff on a motion to dismiss, "the Court is not required to

accept factual allegations that are plainly contradicted" by the relevant agreement).  Determining

whether a contract is ambiguous is a question of law for the trial court.  *See Sayers v. Rochester*

*Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) (citing *W.W.W.*

*Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)).  A contract is ambiguous when

it is "capable of more than one meaning when viewed objectively by a reasonable person" who is

cognizant of the trade practices, customs, and uses at issue and has examined the entire

agreement.  *Id.* at 1095.  When contract language has a "definite and precise meaning" and there

is no reasonable basis for differing interpretations, the contract is not ambiguous.  *Id.* (quoting

*Breed v. Ins. Co. of North Am.*, 385 N.E.2d 1280,1282 (N.Y. 1978)).  Further, parties may not

create ambiguity merely by advocating for conflicting interpretations of their agreement.  *See*

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992); *Bates Advert. USA,*

*Inc. v. McGregor*, 282 F. Supp. 2d 209, 216 (S.D.N.Y. 2003). Similarly, one party cannot

establish ambiguity if its interpretation "strain[s] the contract language beyond its reasonable and

ordinary meaning." *Id.* (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957)).  Nor is ambiguity created because one party attaches a particular, subjective meaning to a term that differs from the term's plain meaning.  *See Slattery Skanska Inc. v. Am. Home Assur. Co.*, 885 N.Y.S.2d 264, 274 (1st Dep't 2009).  These principles follow the rationale that one party cannot contract with another "on the supposition that his words mean one thing while he hopes that a court will adopt a construction by which the same words will mean another, more to his advantage."  *Gaultney-Klineman Art v. Hughes*, 642 N.Y.S.2d 265, 266 (1st Dep't 1996) (internal citations omitted).

Here, the Court finds that there is ambiguity in the FLTTA that prevents it from determining at this stage whether LMRA preemption applies.  The parties both make powerful arguments for how the director-credit provisions of the FLTTA should be interpreted.  Plaintiff's interpretation emphasizes the fact that the FLTTA expressly permits directors to negotiate for provisions more favorable than those in the FLTTA and it specifically forbids employers from entering contracts that would prohibit directors from negotiating for certain kinds of credits.[5] But Defendant highlights, even if indirectly, that Article 16(A)(3)(g) is a prohibition on when a director can be awarded credit.  Thus, as the more specific term, it is not one that can be negotiated, but a limitation on what a director can receive through negotiations.  And Defendant emphasizes that permitting directors to negotiate for credit that does not adhere to Article 16(A)(3)(g) would undermine the protective aspects of the subparagraph and would permit a

---

[5] Contrary to Defendant's contention, this interpretation does not render Article 16(B) "meaningless."  On its face, Article 16(B) provides that "[s]hould any [] Director be dissatisfied with such determination [of director credits], he or she may immediately appeal to the Guild . . . . The Guild may then determine the issue."  Dkt. No. 51-2 at ECF p. 33.  However, Article 16(b) does not seem to limit what materials the Guild may consider when determining the assignment of director credit and thus separate contracts between directors and production companies could be presented to the Guild through this process.

production company to dilute the credit to which a person who directs all elements of a program is entitled by requiring that person to share credit with a person who might have contributed far less to the show. Neither party has presented evidence of the relevant trade practices, customs, and uses at issue. As a result, the Court is unable to conclude at this stage whether Article 16(A)(3)(g) is a minimum term that is incorporated into the Personal Services Agreement and thus must be interpreted in determining Count Four, or whether it is a term that can be negotiated away and thus the Court is not required to refer to the FLTTA when determining Plaintiff's entitlement to director credit. Because the Court finds that Article 16 and its application to the Personal Services Agreement is susceptible to two or more interpretations and is thus ambiguous, Defendant is not entitled to an order at this stage that Count Four is preempted by the LMRA. *See Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 56 (2d Cir. 2012) ("[I]n the context of a motion to dismiss, 'if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state claim.'" (citation omitted)); *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 349 (S.D.N.Y. 2013) ("'[W]hen the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal' on a Rule 12(b)(6) motion." (citation omitted)); *Bank of New York Tr., N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 637 (S.D.N.Y. 2007) ("The Court's role on a 12(b)(6) motion to dismiss is not to resolve contract ambiguities."); *In re Residential Cap., LLC*, 531 B.R. 25, 42 (Bankr. S.D.N.Y. 2015) ("[W]hen a provision of a contract is 'material to the breach of contract claim' and is ambiguous, a FRCP 12(b)(6) motion will fail." (citation omitted)).

The conclusion that the credit provisions of the FLTTA are ambiguous is supported by the trade-specific usage of terms throughout Article 16. *See World Trade Ctr. Properties, L.L.C.*

*v. Hartford Fire Ins. Co.*, 345 F.3d 154, 186 (2d Cir. 2003), *abrogated on other grounds by Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006) ("[W]e have specifically instructed courts to consider the 'customs, practices, usages and terminology as generally understood in the particular trade or business' in identifying ambiguity within a contract. (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).  The three provisions at the center of the parties' disagreement contain several phrases that have no definition in standard dictionaries, such as *Merriam-Webster*.  Article 16 refers to "video credit" and Article 16(A)(1)(d) of FLTTA refers to "screen . . . credits" but it defines neither, either in a definitional section or by plain implication.  Similarly, the FLTTA does not provide context on what is meant by the "form" of a credit.  Article 16(A)(1)(d) suggests that the "form" of the credit refers to the stylization of the credit that is given; it is used to modify the placement of the credit either on a "screen" or in "paid advertising."  *See* Dkt. No. 51-2 at 28.  In contrast, Article 16(A)(3)(g) suggests that the "form" of credit might also refer to the credit's placement—it merely states that a director cannot receive credit "in any form" if the director did not direct the entire broadcast. *Id.* at 31.  Additionally, other terms in these provisions, like "broadcast," *see id.*, although used in common parlance may have different meanings within the television industry.  How these terms are defined in the television industry and how directors generally negotiate for credit, as well as whether the concern for dilution is real and the basis for Article 16(A)(3)(g) or purely hypothetical, could help settle the ambiguities of Article 16.  *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617–18 (2d Cir. 2001) ("When interpreting a state law contract, therefore, an established definition provided by state law or industry usage will serve as a default rule, and that definition will control unless the parties explicitly indicate, on the face of their agreement, that the term is to have some other meaning."); *Beardslee v. Inflection Energy, LLC*,

31 N.E.3d 80, 84 (N.Y. 2015) (noting that oil and gas "leases are 'made in the context of a highly

technical industry, which employs distinct terminology used by those in the business'" and thus

"an agreement for the production of oil and gas must be construed with reference to both the

intention of the parties and the known practices within the industry" (citation omitted)).

Thus, Defendant's motion to dismiss Count Four on LMRA preemption grounds is

denied without prejudice to renewal of the arguments raised therein at summary judgment. *See,*

*e.g.*, *Silverman v. Miranda*, 116 F. Supp. 3d 289, 306 (S.D.N.Y. 2015), *aff'd sub nom. Silverman*

*v. Teamster Loc. 210 Affiliated Health & Ins. Fund*, 725 F. App'x 79 (2d Cir. 2018), *as amended*

(June 7, 2018) (adjudicating LMRA preemption on cross-motions for summary judgment).[6]

## II.    Inconsistency with Personal Services Agreement: Fourth and Fifth Causes of Action

Defendant argues that the fourth and fifth causes of action must also be dismissed

because they are precluded by the Personal Services Agreement.  Dkt. No. 26 at 12.  With

respect to Count Four, Defendant contends that Plaintiff was not entitled to director credit

because he admits in the Amended Complaint that he was a "co-director" and "[t]here is no

provision in Plaintiff's Personal Services Agreement which requires Plaintiff to receive 'co-

director' credit."  *Id.* at 13; Dkt. No. 33 at 13–14.[7]  Plaintiff counters that the Personal Services

---

[6] In its reply brief, Defendant for the first time argues that "[i]n the event that such claims . . . are not dismissed as preempted, this court should find that such claims are subject to FLTTA's mandatory arbitration provision."  Dkt. No. 33 at 12; *see also* Dkt. No. 57 at 2.  However, there is no motion to compel arbitration properly before this Court:  Nowhere in the motion to dismiss or Defendant's moving papers does Defendant seek an order compelling arbitration. Accordingly, Defendant is not entitled to an order compelling arbitration.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) ("[B]ecause [defendant's] motion to dismiss neither sought an order compelling arbitration nor indicated that [defendant] would seek to force [plaintiff] to arbitrate in the future, it was proper not to construe the motion to dismiss as a motion to compel arbitration.").

[7] The application of this argument to the fifth cause of action is misplaced.  The fifth cause of action alleges that Plaintiff and Defendant entered a *new* agreement on December 11, 2020 concerning the Obama Episode and the awarding of director credit.  *See* Am. Compl. ¶ 118. Thus, this new agreement cannot be "belied" by the provisions of the Personal Services

Agreement established the services Plaintiff must have rendered in order to receive "Directed by" credit and is silent as to how many individuals could receive such credit.  Dkt. No. 30 at 19–20.  Plaintiff has the better of the arguments.

As discussed, the Personal Services Agreement gave Plaintiff the right to "'Directed by' screen credit on all episodes of the Series on which Artist renders such services."  Deal Terms § 7.  These services are described in Section 1 of the Deal Terms, which explicitly contemplates there being more than one director on an episode.  *See id.* § 1 ("Artist shall render artistic and professional services as *a* director." (emphasis added)); Exhibit A § 11 (noting that the director credit provisions do not apply to any "'teaser' or 'special' advertising, publicity and/or exploitation relating to . . . any cast member(s), writer(s), director(s), or producer(s)"); *see also* Dkt. No. 26 at 16 (conceding that the Personal Services Agreement "contemplates that there may be more than one director").  The Amended Complaint makes clear that Plaintiff is suing on the theory he deserved "credit as co-director of the Obama [E]pisode" and did not receive that credit.  *See* Am. Compl. ¶¶ 40, 108–09.  The only credit that Plaintiff is entitled to under the Personal Services Agreement is "'Directed by' screen credit."  Thus, it is clear from the Amended Complaint and the documents incorporated by reference that Plaintiff is not seeking "co-director" credit, as Defendant claims; rather, he is seeking "Directed by" credit for his work as co-director.  *See id.* ¶ 108 ("Defendant has breached the terms of the Agreement by failing to give 'Directed by' screen credit on all episodes of the Series on which Mr. Pennolino rendered such services.").  Thus, assuming that Plaintiff's fourth cause of action is not preempted—a question that the Court has deferred ruling on at this juncture—his entitlement to that credit is not "belied" by the Personal Services Agreement.

---

Agreement, which, on the face of Defendant's argument, does not govern the new agreement.

Count Four of the Amended Complaint also alleges that Defendant breached the implied covenant of good faith and fair dealing because it "prevent[ed] Mr. Pennolino from directing episodes of the Series during the term of the contract" and thus "refuse[d] to give him credit for those episodes, and . . . g[ave] credit for those episodes to Mr. Meyer."[8]  *Id.* ¶ 111.  Defendant argues that Plaintiff's good faith and fair dealing claim must fail as a matter of law because Defendant had no obligation to employ Plaintiff as a director and thus Plaintiff can have no claim against Defendant for failing to do so.  Dkt. No. 15–17.  Plaintiff counters that the covenant of good faith and fair dealing prevented Defendant from refusing to employ Plaintiff for "improper or arbitrary reasons."  Dkt. No. 30 at 22–23.  Plaintiff's argument is unpersuasive.

"Under New York law, a covenant of good faith and fair dealing is implied in all contracts."  *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) (quoting *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*, 747 N.Y.S.2d 29, 31 (2d Dep't 2002)).  "[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties," *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983), and operates to preserve the meaning and substance of contractual obligations by ensuring that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," *State St. Bank & Tr. Co.*, 374 F.3d at 170 (2d Cir. 2004) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 501 (N.Y. 2002)); *see also S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 507 (S.D.N.Y. 2021) (a court must determine "whether the unfettered exercise of discretion would deprive a

---

[8] The Personal Services Agreement is governed by New York law.  Dkt. No. 27-2 at ECF p. 11. This choice of law provision also governs the covenant of good faith and fair dealing that is implied by the contract.  *See State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) (noting that the covenant of good faith and fair dealing is implied *by* New York law in every contract).

party of the fruits of the agreement and render a contractual promise illusory" and thus whether reading in the covenant of good faith and fair dealing is appropriate).

However, "[n]o obligation can be implied . . . which would be inconsistent with other terms of the agreement of the parties." *Murphy*, 448 N.E.2d at 91.  Thus, "where application of the covenant of good faith and fair dealing would 'negate a[n] expressly bargained-for clause that allows a party to exercise its discretion,' it cannot be said that its application of the covenant is necessary to preserve the 'fruits of a contract.'  The fruits of a contract do not include a benefit to which a party was not entitled."  *S. Telecom Inc.*, 520 F. Supp. 3d at 507 (quoting *Paxi, LLC v. Shiseido Ams. Corp.*, 636 F. Supp. 2d 275, 286 (S.D.N.Y. 2009)).  In summary, as this Court has previously held, "When the implication of a duty of good faith and fair dealing would be inconsistent with the language of a provision of a contract and is not necessary to make the agreement meaningful, the court will not invoke the covenant.  But where, by contrast, it is necessary to read an obligation of good faith in order to avoid rendering a contract promise illusory—in the words of the cases, where necessary so as not to deprive a contracting party of the 'fruits of the contract'—the courts will not hesitate to infer an obligation to act in good faith." *Id.*  Here, the Court finds that the application of the covenant of good faith and fair dealing to the Personal Services Agreement would undermine the contract.

Plaintiff and Defendant negotiated a pay-or-play provision in the Personal Services Agreement.  *See* Deal Terms § 4.1.  Under the pay-or-play provision, Defendant was obligated to pay Plaintiff a weekly salary during the initial term of the agreement, whether or not it used Plaintiff's director services.  *See id.*; *see also In re Heritage Media Grp.*, 2009 WL 1110653, at *1 (Bankr. N.D. Tex. Apr. 21, 2009) ("The television and motion picture industry recognize a 'pay or play' contract as a standard provision whereby the principal can engage the services of an

agent and pay him or her to use the services of the artist or pay not to use the services."). That is, Defendant was not obligated to use Plaintiff's directorial services, but was obligated to pay Defendant the weekly salary, even if it did not. And the decision to use or not to use Plaintiff as a director on any episode was left to Defendant's discretion. Section 9 of the Standard Terms explicitly states that "[f]ailure of Company actually to use the services of Artist, in whole or in part, shall not be deemed a breach of this Agreement by Company, and in any such event, Artist shall not be entitled to any damages by reason thereof." Plaintiff agreed that "Company shall have the unqualified right at all times to engage other artists, employees and consultants to work on the Project." Exhibit A § 9; *see also* Deal Terms § 1 (stating that "Artist agrees and represents that Artist shall . . . report and be available to render services at all times and places *which Company may from time to time reasonably require*" (emphasis added)).

Plaintiff could have negotiated a provision requiring that Defendant use his services on a minimum number of—or on all—episodes of the Series. But he did not. Instead, the "fruits of the contract" that Plaintiff negotiated was a weekly salary, regardless whether he provided director services, and Plaintiff received the benefits of that bargain—there are no allegations that Plaintiff was not paid the weekly rate. Thus, it is not necessary to read the covenant of good faith and fair dealing into the contract to give the contract meaning and doing so would give Plaintiff a benefit (the right to direct episodes) to which he was not entitled. *See State St. Bank & Tr. Co.*, 374 F.3d at 168–70 (holding that covenant of good faith and fair dealing did not prohibit bank from "unreasonably or arbitrarily withholding consent" for the sale of assets because bank had the right to do so under the contract with "no express restrictions" and bank "did not deprive the defendants of the fruits of the bargain for which they contracted—they had

already received over $100 million in credit based on their promise to comply with the negative

covenants regarding the sale of assets").[9]

Plaintiff argues that "[c]ourts repeatedly have held there is a breach of the implied

covenant of good faith, when, for improper or arbitrary reasons, a defendant refuses to use the

services of an artist under a pay or play cause." Dkt. No. 30 at 22–23.  However, the two cases

that Plaintiff cites, both decided under California law, do not support this contention.  First, the

court in *Lust v. Animal Logic Entertainment US*, 2019 WL 11908135 (C.D. Cal. Sept. 18, 2019)

did not find that the agreement in question was a "pay or play" agreement.  Rather, the court

found an implied promise, based on the parties' actions, that the plaintiff's projects would be

produced.  *See id.* at *11 ("[A]t the time that the [agreement] was executed and for a significant

period thereafter, it was generally understood and anticipated that [the plaintiff] might actively

produce some of the projects that he . . . [was] pursuing.  This shows that it was not the mutual

expectation or understanding of these parties for much of their relationship that [the plaintiff]

would, as a matter of course, be confined to the 'pay' component of his 'pay or play'

arrangement.").  As a result, the court concluded that the covenant of good faith and fair dealing

could attach to this implied promise.  Thus, *Lust* cannot be read to suggest, as Plaintiff argues,

that Defendant violated the covenant of good faith and fair dealing by refusing to use Plaintiff as

a director for "improper or arbitrary reasons."

---

[9] Plaintiff's Amended Complaint and memorandum of law can be read to suggest that Plaintiff was deprived of another benefit of the contract—the residual revenues that accompany director credit—and thus that the failure to assign Plaintiff directing roles deprived him of the fruits of the contract.  *See* Am. Compl. ¶ 114; Dkt. No. 30 at 22.  However, the contract makes clear that the weekly salary was "full and complete consideration for all of Artist's services and thus results and proceeds thereof and for all rights herein granted."  Deal Terms § 4.1.  Thus, there was no promise for residual revenues that was rendered illusory by Defendant's failure to assign Plaintiff directing roles.

The court's holding in *Locke v. Warner Brothers*, 66 Cal. Rptr. 2d 921 (Cal. Ct. App. 1997) is also distinguishable.  In *Locke*, Warner Brothers entered a two-part development deal with Locke.  *Id.* at 922.  The first part of the development deal gave Warner Brothers the exclusive right to review Locke's projects and determine whether to develop them for thirty days before she was permitted to show the projects to other studios, in exchange for $250,000 per year.  *Id.*  The second part of the development deal was a pay or play directing arrangement between Locke and Warner Brothers.  *Id.*  Locke's second cause of action was for breach of contract for "refusing to consider the projects prepared by [Locke] and depriving [Locke] of the benefit of the bargain of the Warner-Locke agreement."  *Id.* at 925 (citation omitted).  The trial court found, on summary judgment, that Locke could not have violated the covenant of good faith and fair dealing because,

> Warner had no obligation either to put into development any of the projects submitted to the studio for its consideration, or to "hand off" to Locke any scripts for her to direct that it previously had acquired from someone else.  The implied covenant of good faith and fair dealing cannot be imposed to create a contract different from the one the parties negotiated for themselves.

*Id.* at 923–24.  The appellate court reversed.  Although the appellate court ostensibly overturned the trial court with respect to both parts of the development agreement, *see id.* at 926 ("[T]he value in the subject development deal was not merely the guaranteed payments under the agreement, but also the opportunity to direct and produce films and earn additional sums, and most importantly, the opportunity to promote and enhance a career."), the court's reasoning was specific to the first part of the development deal giving Warner Brother's an exclusive period during which to review Locke's proposals.  As the court held, "While Warner was entitled to reject Locke's proposals based on its subjective dissatisfaction, the evidence calls into question whether Warner had an honest or good faith dissatisfaction with Locke's proposals, or whether it merely went through the motions of purporting to 'consider' her projects."  *Id.*; *see also id.* ("The

above evidence raises a triable issue of material fact as to whether Warner breached its contract with Locke by categorically refusing to work with her, irrespective of the merits of her proposals."). As the court itself indicated, however, Warner Brothers only had the "*discretion . . .* with respect to developing Locke's projects," not "the express right to refrain from working with Locke." *Id.* at 927. In contrast, the express right to refrain from working with a director is inherent in the very nature of a pay or play provision—and was made explicit here, *see* Exhibit A § 9. Thus, to the degree that the court did hold that a pay or play provision implies a covenant of good faith and fair dealing, its reasoning is not persuasive or controlling here.

Even if the Court adopts Plaintiff's reading of the covenant of good faith and fair dealing and holds that refusing to hire a director under a pay or play contract for an improper or arbitrary purpose represents a violation of the contract, the Court would be compelled to conclude that no violation has occurred because the Amended Complaint does not allege an improper motive. The Amended Complaint does allege that Defendant refused to exercise its option to renew the Personal Services Agreement on account of Plaintiff's age. *See, e.g.*, Am. Compl. ¶¶ 47–49, 58–59, 60, 86. But the Amended Complaint is devoid of allegations that would suggest Plaintiff was not offered directing roles on account of his age. Thus, Plaintiff does not allege that Defendant prevented Plaintiff from directing episodes of the Series for an improper purpose and Defendant could not have violated the covenant of good faith and fair dealing, as Plaintiff would have the Court understand it.[10]

---

[10] Plaintiff also alleges that Plaintiff breached the Personal Services Agreement directly by preventing him from directing episodes of The Daily Show. Am. Compl. ¶ 110. However, as described above, Defendant was under no obligation to offer Plaintiff directing roles and thus Plaintiff has failed to state a claim for breach of contract on these grounds.

Accordingly, Plaintiff's fourth cause of action is dismissed insofar as it alleges a violation of the covenant of good faith and fair dealing.

### III.    Breach of Contract: Fifth and Sixth Causes of Action

Plaintiff's fifth cause of action pleads that Defendant and Plaintiff entered into a separate contract with respect to director credit for the Obama Episode, which Defendant breached when it did not award Plaintiff credit for the episode. *See* Am. Compl. ¶¶ 117–25. The sixth cause of action pleads that Defendant and Plaintiff entered into an agreement to exercise the first option to extend the Personal Services Agreement, which Defendant breached when it did not exercise its option for Plaintiff's services. *See id.* ¶¶ 126–32.

A contract is "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." *Lauture v. Int'l Bus. Machines Corp.*, 216 F.3d 258, 261 (2d Cir. 2000) (quoting Restatement (Second) Contracts § 1 (1979)). To establish an enforceable contract under New York law,[11] there must be "an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 208 (S.D.N.Y. 2015) (quoting *Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 46 (1st Dep't 2009)); *see also Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 658 (2d Cir. 1996) ("A valid contract requires a manifestation of mutual assent to a bargained-for exchange."); N.Y. Jur. 2d Contracts § 9. In turn, in order to succeed on a breach of contract claim under New York law, a plaintiff must show (1) the existence of a contract; (2) performance by plaintiff; (3) a breach by the defendant; and (4) damages. *See Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000); *see also Berman v. Sugo LLC*, 580

---

[11] As noted, the Personal Services Agreement is governed by New York law. Dkt. No. 27-2 at ECF p. 11. Neither party argues that any law other than New York law would govern the contracts alleged in the fifth and sixth causes of action.

F. Supp. 2d 191, 202 (S.D.N.Y. 2008) (same).  "A sufficient pleading for breach of contract must 'at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion.'"  *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 624 (S.D.N.Y. 2013) (quoting *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 286 (S.D.N.Y. 1991)).  "New York courts require plaintiffs to 'plead the provisions of the contract upon which the claim is based'—in other words, 'a complaint in a breach of contract action must set forth the terms of the agreement upon which liability is predicated.'"  *Anders v. Verizon Commuc'ns*, 2018 WL 2727883, at *8–9 (S.D.N.Y. June 5, 2018) (quoting *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, 1993 WL 312899, at *3 (S.D.N.Y. Aug. 12, 1993)).

Defendant argues that Plaintiff's fifth and sixth causes of action must fail because the Amended Complaint does not plead the requisite elements of breach of contract and specifically neither adequately alleges contract formation.  Dkt. No. 26 at 18.  The Court addresses each cause of action in turn.

### A.    Fifth Cause of Action

Plaintiff's fifth cause of action alleges that Plaintiff and Defendant formed a separate contract on December 11, 2020.  Am. Compl. 118.  On that day, DePace, the Supervising Producer for The Daily Show, sent an email to Plaintiff and to others with a call sheet for the Obama Episode, that listed Plaintiff and Meyer as directors.  *Id.* at 36–38.  Plaintiff alleges that this call sheet represents an "offer to give [Plaintiff] credit for co-directing the Obama [E]pisode," and Plaintiff accepted this offer by co-directing the episode.  *Id.* ¶¶ 120–22.  Defendant, in turn, breached this agreement by not awarding Plaintiff credit as co-director on the episode.  *Id.* ¶ 123.

Defendant argues that the fifth cause of action must be dismissed because Plaintiff has "fail[ed] to plead the requisite elements of an enforceable agreement by DePace to provide him

with . . . co-directing credit." Dkt. No. 26 at 19.  Specifically, Defendant argues that the call

sheet does not represent an offer for co-directing credit and there was no consideration for the

contract because Plaintiff was already required to report to work when requested by Defendant

under the Personal Services Agreement.  *Id.*  Plaintiff counters that the call sheet represents a

modification of the Personal Services Agreement wherein Plaintiff agreed to give up his right to

"Directed by" credit for the lesser credit of co-director in exchange for working on the Obama

Episode.  Dkt. No. 30 at 26–27.  Plaintiff has thus failed to allege sufficient facts to establish that

a separate contract was formed for co-director credit.

   "New York law permits parties to modify a contract 'by another agreement, by course of

performance, or by conduct amounting to a waiver or estoppel.'"  *Alessi Equip., Inc. v. Am.*

*Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 502 (S.D.N.Y. 2022) (quoting *CT Chems. (U.S.A.)*

*Inc. v. Vinmar Impex, Inc.*, 613 N.E.2d 159, 162 (N.Y. 1993)).  "Fundamental to the

establishment of a contract modification is proof of each element requisite to the formulation of a

contract, including mutual assent to its terms."  *Beacon Terminal Corp. v. Chemprene, Inc.*,

429 N.Y.S.2d 715, 718 (2d Dep't 1980); *see also Alessi Equip., Inc.*, 578 F. Supp. 3d at 502

(same).  However, the call sheet cannot represent an offer to modify the contract and Plaintiff's

performance of the services specified in the call sheet cannot represent acceptance of the

purported offer.  A contract modification definitionally entails a change in a pre-existing

contractual relationship between the parties.  *See Modification*, Black's Law Dictionary (11th ed.

2019) (defining "modification" as "[a] change to something; an alteration or amendment" and

giving as a "contextual illustration[]" the phrase "a contract modification").  But the purported

modification did not change the contractual relationship between Plaintiff and Defendant.  Under

the Personal Services Agreement, Plaintiff was required to "render all services customarily

rendered by directors in the television industry" "at the Company's discretion."  Deal Terms § 1.

As the Standard Terms make clear, "Artist's services shall be rendered for and as directed by

Company at such [reasonable] places and on such [reasonable] locations as Company may from

time to time [reasonably] designate."[12]  Standard Terms § 1.  Thus, the email listing Plaintiff as

the "director" on the Obama Episode cannot be construed as an offer; rather, at most, it was a

direction to Plaintiff to perform director services on the Obama Episode, as contemplated by the

Personal Services Agreement.  And Plaintiff's performance of those services was not an

acceptance of the purported offer because Plaintiff was required to render director services "as

Company may from time to time [reasonably] designate."  Thus, the call sheet and Plaintiff's

performance of director services could not have modified the Personal Services Agreement

because neither represents an offer or acceptance of new contractual obligations.

  Even assuming that the call sheet and Plaintiff's performance reflect a valid modification

of the Personal Services Agreement, the modification is entirely silent as to whether Plaintiff was

entitled to co-directing credit.  The alleged offer came in the form of a call sheet, which listed

two directors, Plaintiff and Meyer.  *See* Am. Compl. ¶¶ 37–38.  The Amended Complaint does

not allege that the call sheet contained any other information about the awarding of director

credits.  Instead, the Amended Complaint alleges that "DePace . . . offered to have Mr. Pennolino

co-direct the Obama [E]pisode, and give him credit for directing that episode, when she sent an

email to Mr. Pennolino and others with the call sheet listing his as a director."  *Id.* ¶ 118.  But

this allegation rests upon the conclusory assertion that the alleged modification addressed the

issue of director credits.  At most the facts alleged suggest that Plaintiff and Defendant modified

---

[12] The words in brackets are read into the Standard Terms through the Rider to Standard Terms.
*See* Dkt. No. 27-2 at ECF p. 13.

the Personal Services Agreement when Defendant offered to have Plaintiff direct the Obama Episode and Plaintiff accepted that offer—a contention that the Court has already rejected. There are no facts to support that the call sheet made a promise for credit, either implicitly—based on, for example, industry practice—or explicitly.  And the conclusory allegation that the modification altered the director-credit provisions of the Personal Services Agreement is not cognizable by this Court.  *See, e.g.*, *Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 213 (S.D.N.Y. 2021) ("Conclusory allegations that a contract existed or that it was breached do not suffice." (quoting *Emerald Town Car of Pearl River, LLC v. Philadelphia Indem. Ins. Co.*, 2017 WL 1383773, at *7 (S.D.N.Y. Apr. 12, 2017))).  Because Plaintiff has not alleged that the modification gave him the right to co-directing credit on the Obama Episode, he has not alleged a breach of the specific promise at issue in the fifth cause of action and thus his breach of contract claim must fail.  *See Radin v. Albert Einstein Coll. Of Med. Of Yeshiva Univ.*, 2005 WL 1214281, at *10 (S.D.N.Y. May 20, 2005) ("[T]o state a valid claim for a breach of contract, a plaintiff must state when and how the defendant breached the specific contractual promise."); *Sud v. Sud*, 621 N.Y.S.2d 37, 38 (1st Dep't 1995) (holding that breach of contract claim properly was dismissed where "plaintiff's amended complaint, purporting to set forth a cause of action for breach of a 1976 contract . . . [failed] to allege, in nonconclusory language, as required, the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated").

Thus, Plaintiff's fifth cause of action must fail.

### B.    Sixth Cause of Action

Plaintiff's sixth cause of action alleges that Defendant breached an agreement to exercise its option to renew the Personal Services Agreement for a second year.  Specifically, Plaintiff alleges that in the spring of 2021, Katz, Flanz, and DePace all promised him that Defendant

would exercise its first option to extend the Personal Services Agreement.  Am. Compl. ¶ 127.
As Plaintiff tells it, the option provision in the Personal Services Agreement constituted an offer
by him to work for Defendant for an additional term starting on July 2, 2021, and that the
promises made by Katz, Flanz, and DePace constituted an acceptance of that offer, thereby
forming a contract.  *Id.* ¶¶ 128–29.  He alleges that Defendant breached that promise when
Defendant served a notice pursuant to the Personal Services Agreement on May 28, 2021, stating
that Defendant would not exercise its option.  *Id.* ¶ 130.

Defendant moves to dismiss the sixth cause of action for failure to state the elements of a
claim for breach of contract and because its allegations contradict the terms of the Personal
Services Agreement.  Dkt. No. 26 at 22–23.  Specifically, Defendant argues that the allegations
regarding the statements made by Katz, Flanz, and DePace are conclusory; that, even if Katz,
Flanz, and DePace made promises to Plaintiff, those promises could not give rise to a new
contract—apart from the Personal Services Agreement—because the Amended Complaint does
not allege valid consideration for the promise; and that when Defendant sent the May 28, 2021
notice, it was simply exercising rights it had pursuant to the Personal Services Agreement and
was not breaching a new agreement.  *Id.*  Defendant's arguments prevail—Plaintiff's sixth cause
of action fails for lack of consideration.

Contract formation requires consideration.  *Delta Galil USA*, 135 F. Supp. 3d at 208.  For
consideration to be valid, it must be "bargained for," meaning that the promisor must seek it in
exchange for his promise, and the promisee must give it in exchange for that promise.  *See*
*Ferguson v. Lion Holdings, Inc.*, 312 F. Supp. 2d 484, 494 (S.D.N.Y. 2004) ("Consideration is
simply a bargained-for exchange of promises or performance."); *Startech, Inc. v. VSA Arts*, 126
F. Supp. 2d 234, 236 (S.D.N.Y. 2000) ("Consideration is defined as either a bargained for gain

or advantage to the promisee or a bargained for legal detriment or disadvantage to the promisor."); Restatement (Second) Contracts § 71 (same).  It is axiomatic that past consideration cannot support the formation of a new contract.  *See Capstone Bus. Funding, LLC v. Shames Constr. Co., Ltd.*, 169 N.Y.S.3d 599, 600 (1st Dept 2022) ("[A] promise to perform an existing obligation is not valid consideration to provide a basis for a contract." (citations omitted)); *Lebedev v. Blavatnik*, 142 N.Y.S.3d 511, 517 (2d Dep't 2021) ("[G]enerally, past consideration is no consideration and cannot support an agreement because the detriment did not induce the promise." (citation omitted)); *Tierney v. Capricorn Invs., L.P.*, 592 N.Y.S.2d 700, 703 (1st Dep't 1993) ("Neither a promise to do that which the promisor is already bound to do, nor the performance of an existing legal obligation constitutes valid consideration.").

Plaintiff's allegations fail to establish that a new contract was formed by the promises of Katz, Flanz, and DePace because Plaintiff fails to allege new consideration to support the agreement.  The premise of Plaintiff's claim is that his willingness to continue to work for Defendant for an additional year beginning on July 2, 2021, constituted an offer and Defendant formed a new contract with Plaintiff to accept that offer when its agents promised that the first option would be exercised.  *See* Am. Compl. ¶¶ 127–29.  Plaintiff thus argues that there was valid consideration from Defendant, because it gave up the legal right not to exercise its option.  Dkt. No. 30 at 30.  However, Plaintiff fails to identify in the Amended Complaint any consideration that he gave in return for Defendant's promise to exercise its option under the Personal Services Agreement.  Plaintiff had already committed to working for Defendant beginning on July 2, 2021, if Defendant exercised its option, through the Personal Services Agreement.  *See* Deal Terms § 5.  In exchange for holding open his unilateral offer to work for Defendant, Plaintiff received consideration:  He received compensation on a pay-or-play basis

for each week that The Daily Show was in production.  *See id.* § 4.  Thereafter, Plaintiff could

not "offer" to work for Defendant starting in July 2021; he had already contractually committed

to do so, if Defendant wanted him to.  As a result, even if the promise was made to exercise the

option (and to forgo Defendant's right *not* to exercise the option four weeks prior to the end of

the previous contract term), which the Court assumes for purposes of this motion, no

consideration was exchanged for that promise, and thus the promise could not form the basis of a

separate contract.[13]  When Defendant elected not to renew Plaintiff's contract in May 2021, it

was not violating a new agreement that had been reached in the spring of 2021; Defendant was

exercising a right it had obtained in June of 2020 when Plaintiff and Defendant entered the

Personal Services Agreement.

Plaintiff argues that "[a]n oral promise to accept an option, creates a bilateral contract."

Dkt. No. 30 at 28–29 (citing *Siders v. Odak*, 513 N.Y.S.2d 549, 551–52 (3d Dep't 1987).  But he

misconstrues the caselaw that he cites.  As the court in *Siders* noted, "an option is a unilateral

contract which calls for acceptance in the form of a promise to create a second, bilateral

contract. . . . [The plaintiff's] notification to defendants that she was exercising the option

together with her accompanying promise to perform created a bilateral contract of sale."  513

N.Y.S.2d at 551–52 (citations omitted).  Here, Plaintiff does not allege that Defendant, through

its agents, exercised its option.  Nor could he:  The option was deemed exercised by default

"unless Company has provided Artist with written notice to the contrary no later than four (4)

weeks prior to the end of the previous" term.  Deal Terms § 5.  Rather, he alleges that Defendant,

---

[13] The Court also questions whether Defendant's agents could make such a promise and, if they could, whether the promise could be enforceable as a matter of law.  Section 20 of Exhibit A to the Personal Services Agreement, provides that "[n]o officer, employee or representative of Company has any authority to make any representation or promise in connection herewith or the subject matter hereof which is not contained herein."  Standard Terms § 20.

through its agents, *promised* to exercise the option and to forgo its right to provide written notice

that it would not exercise its option.  *See* Dkt. No. 30 at 30 ("[T]he sixth cause of action . . .

asserts a breach of a separate agreement to exercise the option contained in the Personal Services

Agreement.").  But, as noted, this new contract was not supported by new consideration—

Plaintiff had already committed to work for Defendant.  Thus, Plaintiff and Defendant did not

form a new contract and Defendant's sixth cause of action must fail.

## CONCLUSION

Plaintiff's motion to dismiss the fourth, fifth, and sixth causes of action is GRANTED IN

PART and DENIED IN PART.  The Clerk of Court is respectfully directed to close Dkt. No. 25.


SO ORDERED.


Dated: May 11, 2023
      New York, New York
                                         LEWIS J. LIMAN
                               United States District Judge